**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| YADIRA TORRES, Derivatively on Behalf of Nominal Defendant QUANEX BUILDING PRODUCTS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> GEORGE L. WILSON, SCOTT M. ZUEHLKE, SUSAN F. DAVIS, BRADLEY E. HUGHES, JASON D. LIPPERT, DONALD R. MAIER, MANISH H. SHAH, AMIT SINGHI, CURTIS M. STEVENS, and WILLIAM E. WALTZ, JR., <br><br> Defendants, <br><br> and <br><br> QUANEX BUILDING PRODUCTS CORPORATION <br><br> Nominal Defendant. | Case No. _____ <br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Yadira Torres ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Quanex Building Products Corporation ("Quanex" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available

documents, conference call transcripts and announcements made by Defendants, United States

Securities and Exchange Commission ("SEC") filings, press releases published by and regarding

Quanex, legal filings, news reports, securities analysts' reports about the Company, filings in

the securities class action captioned *Zanol v. Quanex Bldg. Prods. Corp., et al.*, Case No. 4:25-

cv-04453 (S.D. Tex.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of Quanex

against certain of its current and former officers and members of the Company's Board (the

"Individual Defendants")[1] for breaches of their fiduciary duties between at least June 6, 2024, and

September 4, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as

set forth below.

2.    Quanex is a global building products manufacturing company headquartered in

Houston, Texas. In September 2022, Defendant Wilson announced plans to dramatically grow

Quanex and "achieve $2 billion of revenue" annually through a combination of "organic growth,

inorganic growth or growth through innovation." Defendant Wilson referred to this as Quanex's

"Growth with Purpose" or "Bigger" strategy.

3.    Initial attempts to significantly grow Quanex's revenue failed, so the Company

decided to achieve growth through acquisitions. In April 2024, Quanex offered to acquire Tyman

PLC ("Tyman"), a United Kingdom-based global building products company, for an aggregate

consideration of $1.1 billion (the "Tyman Acquisition"). On August 1, 2024, Quanex announced

---

[1] The Individual Defendants are George L. Wilson ("Wilson"), Scott M. Zuehlke ("Zuehlke"), Susan F. Davis ("Davis"), Bradley E. Hughes ("Hughes"), Jason D. Lippert ("Lippert"), Donald R. Maier ("Maier"), Manish H. Shah ("Shah"), Amit Singhi ("Singhi"), Curtis M. Stevens ("Stevens"), and William E. Waltz, Jr. ("Waltz"). "Defendants" means Quanex and the Individual Defendants.

it had closed on its acquisition of Tyman.

4.      Throughout the Relevant Period, Individual Defendants told shareholders and the public that the Tyman Acquisition was a success, that Quanex was successfully integrating Tyman's international facilities into the Company's global operations, and that the Tyman Acquisition would accelerate the Company's growth and value. However, in reality, the facilities and systems acquired by the Company were faulty and defective even before the acquisition, and the Company underinvested in tooling and equipment maintenance at its acquired facilities after the acquisition, which degraded key manufacturing equipment leading to significant costs and delayed benefits from the Tyman Acquisition.

5.      The truth began to emerge on September 4, 2025, when Quanex issued a press release discussing its financial results for the third quarter of fiscal year 2025 (the "3Q25 Press Release"). In the 3Q25 Press Release, the Company disclosed for the first time that, among other things, there were "*operational issues related to the legacy Tyman window and door hardware business in Mexico that are ongoing*"[2] which "impacted results *more than expected* during the third quarter of 2025." The Company reported diluted earnings per share ("EPS") of ($6.04), compared to $0.77 in the prior year, and an adjusted EBIDTA of $70.30. Moreover, the Company disclosed that it was "adjusting for lower expected volumes and *pushing out the timing of when [the Company] expect[s] to realize procurement savings*" from the Tyman Acquisition.

6.      On this news, the Company's stock price fell $2.73, or 13%, from a closing price of $20.91 per share on September 4, 2025, to a closing price of $18.18 per share on September 5, 2025, on heavy trade volume.

7.      On September 5, 2025, the truth fully emerged during an earnings call that the

---

[2] Unless otherwise stated, all emphasis is added.

Company held to discuss Quanex's third quarter results for fiscal year 2025 (the "3Q25 Earnings Call"). During the 3Q25 Earnings Call, Defendant Wilson stated that the Company faced significant issues with its hardware business in Mexico, stating, in relevant part:

> I want to also take a moment to detail some ***operational issues we inherited*** that are specific to our window and door hardware business in Mexico, which impacted results in the third quarter more than expected.
>
> Specifically, we identified tooling and equipment issues at our Monterrey, Mexico facility, which, among other things, impacts backlog and leads to inefficiencies and increased costs for items such as expedited freight. ***These operational challenges negatively impacted EBITDA in the Hardware Solutions segment by almost $5 million in the third quarter alone*** . . . .
>
> What we identified is really the systems underneath how do you methodically anticipate and plan for tooling repairs. I don't want to say it was nonexistent, ***but again, not up to the standards***. And you get to a point where if you're not maintaining tools and equipment, but you continue to try to run and you block off cavities, then it creates quality problems and other issues, and it will eventually catch up to you.
>
> And I think ***what we identified midyear here as we get deeper and deeper into the integration*** [of Tyman] and we start understanding the processes and kind of put Quanex procedures and policies into place is that ***we were underinvested and that the tooling condition and the equipment condition was not where we wanted to be***, and it was not going to be healthy to support our customers. ***So we had to make some changes and fix some things before it was catastrophic***.

8.      On this news, the Company's stock price fell $1.98, or 10.9%, from a closing price of $18.18 per share on September 5, 2025, to a closing price of $16.20 per share on September 8, 2025, on heavy trade volume.

9.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material fact to the investing public. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company inherited problems from the Tyman Acquisition, namely with Tyman's Mexico facility; (ii) the Company significantly

underinvested in its procedures and policies regarding tooling and equipment maintenance in its acquired facilities; (iii) the Company's insufficient investment in tooling and equipment conditions caused the equipment to degrade to near "catastrophic" levels; (iv) because of the inherited problems and underinvestment in equipment maintenance the Company was likely to incur significant costs and delayed benefits from the Tyman Acquisition; (v) the Company knew that there were issues regarding tooling and equipment maintenance in its facilities; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

10.     As a result of the foregoing, the Securities Class Action was filed against the Company and Defendants Wilson and Zuehlke in the United States District Court for the Southern District of Texas.

11.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and paying class-wide damages in the Securities Class Action, as well as additional losses including reputational harm and loss of goodwill.

12.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Quanex's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with

the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5), Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

14. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17. In connection with the acts, conduct and other wrongs complained of herein, the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Quanex maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information,

occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

**PARTIES**

*Plaintiff*

19.    Plaintiff is, and has been at all relevant times, a continuous shareholder of Quanex.

*Nominal Defendant*

20.    Nominal Defendant Quanex is a Delaware corporation with its principal executive offices located at 945 Bunker Hill Road, Suite 900, Houston, Texas 77024. Quanex's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "NX."

*Individual Defendants*

21.    Defendant Wilson has served as the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board since January 1, 2020. According to the Company's public filings, Defendant Wilson received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $4,753,370 |
| 2025 | $3,635,424 |

22.    Defendant Zuehlke has served as the Company's Chief Financial Officer ("CFO") and Treasurer since November 1, 2019. According to the Company's public filings, Defendant Zuehlke received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $1,589,550 |
| 2025 | $1,249,280 |

23.     Defendant Davis has served as a director of the Company since 2007. Davis also serves as Lead Director of the Company's Executive Committee, Chair of the Company's Nominating and Corporate Governance Committee, and as a member of the Company's Compensation and Management Development Committee. According to the Company's public filings, Defendant Davis received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $240,311 |
| 2025 | $249,365 |

24.     Defendant Hughes has served as a director of the Company since 2022. Hughes also serves as Chair of the Company's Audit Committee and as a member of the Company's Executive Committee. According to the Company's public filings, Defendant Hughes received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $194,707 |
| 2025 | $209,427 |

25.     Defendant Lippert has served as a director of the Company since 2021. Lippert also serves as a member of the Company's Compensation and Management Development Committee. According to the Company's public filings, Defendant Lippert received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
| --- | --- |
| 2024 | $196,139 |
| 2025 | $204,946 |

26.     Defendant Maier has served as a director of the Company since 2019. Maier also serves as Chair of the Company's Compensation and Management Development Committee.

According to the Company's public filings, Defendant Maier received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $202,323 |
| 2025 | $209,476 |

27. Defendant Shah has served as a director of the Company since 2024. Shah also serves as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Shah received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $33,866 |
| 2025 | $197,344 |

28. Defendant Singhi has served as a director of the Company since 2024. Singhi also serves as a member of the Company's Audit Committee. According to the Company's public filings, Defendant Singhi received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $33,866 |
| 2025 | $196,754 |

29. Defendant Stevens served as a director of the Company from 2010 until February 27, 2025. During his time with the Company, Stevens served as Chair of the Company's Audit Committee. According to the Company's public filings, Defendant Stevens received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $213,072 |
| 2025 | $148,740 |

9

30.     Defendant Waltz has served as a director of the Company since 2020. Waltz also serves as a member of the Company's Compensation and Management Development Committee. According to the Company's public filings, Defendant Waltz received the following compensation from the Company during the Relevant Period:

| Fiscal Year | Total Compensation |
|---|---|
| 2024 | $198,739 |
| 2025 | $207,561 |

*Non-Party Confidential Witnesses*

31.     This action is based on Plaintiff's review, by counsel, of public documents, including the Consolidated Amended Complaint ("CAC") in the Securities Class Action (ECF No. 28), which contains allegations based on interviews with former Quanex employees (referred to herein as "FE1–5") who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in that case. These former employees provided information on a confidential basis and were described in the CAC with sufficient detail to establish their reliability and personal knowledge.

32.     FE1 was a Senior Process Engineer at the Company's factory located in Monterrey, Mexico (the "Monterrey Facility") from January 2024 through September 2024. FE1 initially worked at Tyman, and then continued to work at Quanex following the Tyman Acquisition. FE1 oversaw the Monterrey Facility's seventeen presses, which used materials such as aluminum and steel to generate components used in coils, locking mechanisms, stop blocks, and other fenestration parts. FE1 reported directly to the Monterrey Facility's manager.

33.     FE2 was a Supply Manager at the Company's facility located in Statesville, North Carolina (the "Statesville Facility") from October 2023 to September 2024. FE2 also initially

10

worked at Tyman, and then continued to work at Quanex following the Tyman Acquisition. FE2 oversaw purchasing and planning functions, including coordinating with the Monterrey Facility for supplies for the Statesville Facility. FE2 reported directly to Tyman's Director of Supply Chain, and then to the Statesville Facility's Manager.

34.    FE3 was a Supply Chain Specialist at the Company's Statesville Facility from November 2023 to January 2025. FE3 also initially worked at Tyman, and then continued to work for Quanex following the Tyman Acquisition. FE3 was responsible for scheduling production and oversaw six departments, each containing approximately three production lines and machines, including Statesville's main products, such as coils and window seals. FE3 learned of problems at the Monterrey Facility through their course of work.

35.    FE4 was a Training and Development Specialist at the Company's Statesville Facility from May 2017 to November 2024. FE4 also initially worked at Tyman, and then continued to work for Quanex following the Tyman Acquisition. FE4 was responsible for training employees on how to perform manufacturing jobs, and FE4 trained Statesville Facility employees on the floor which manufactured products, including products sent to the Monterrey Facility. FE4 reported to the Statesville Facility's manager.

36.    FE5 was a Plant Manager, and then later Director of Operations, at the Company from 2019 to June 2025. After the Tyman Acquisition, Quanex tasked FE5 with overseeing the Monterrey Facility. FE5 made weekly trips to the Monterrey Facility and reported to the Company's Vice President of Operations.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.    By reason of their positions as officers and/or directors of Quanex, and because of their ability to control the business and corporate affairs of Quanex, the Individual Defendants

11

owed Quanex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Quanex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Quanex and its shareholders.

38. Each director and officer of the Company owes to Quanex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Quanex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Quanex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Quanex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42. As senior executive officers and directors of a publicly-traded company whose

common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

43.     To discharge their duties, the officers and directors of Quanex were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Quanex were required to, among other things:

(i)     Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Quanex's own Code of Business Conduct and Ethics (the "Code of Conduct");

(ii)     Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii)     Remain informed as to how Quanex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Quanex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Quanex's operations would comply with all applicable laws and Quanex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to Quanex and the shareholders the duty of loyalty requiring that each favor Quanex's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Quanex and were at all times acting within the course and scope of such agency.

14

46.     Because of their advisory, executive, managerial, and directorial positions with Quanex, each of the Individual Defendants had access to adverse, non-public information about the Company.

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Quanex.

## QUANEX'S CODE OF CONDUCT

48.     The Company's Code of Conduct states that:

It is the policy of Quanex . . . that Quanex and its subsidiaries worldwide (collectively, the "Company") shall conduct its business in accordance with the highest standards of integrity, Company policies, applicable divisional policies and all applicable laws and regulations of the United States and the states, counties and cities and other jurisdictions in which the Company operates ("ethical & lawful conduct") . . . . All employees, officers, directors and independent agents acting on behalf of the Company ("Associates") shall respect and comply with all standards of ethical & lawful conduct. All illegal and/or unethical acts are prohibited under this policy.

49.     Under a section titled "Responsibility," the Code of Conduct states, in relevant part:

All members of management are responsible for:
- Maintaining a constant awareness of potential illegal or unethical situations or behaviors and providing the leadership to ensure that Associate behavior is in compliance with this Code.
- Ensuring Associates are aware of and fulfill their responsibility to immediately report knowledge of all good faith actual or suspected violations of the standards of ethical & lawful conduct using the reporting procedures outlined in the Reporting Procedures section of this Code.
- Taking immediate action to respond to all Associate concerns or complaints by notifying the Location General Manager or the Location Human Resources Manager.
- If notifying the Location General Manager or Location Human Resources Manager is uncomfortable or inappropriate, the reporting procedures outlined in the Reporting Procedures section of this Code must be used to immediately notify an appropriate Company contact. Compliance with the Reporting Procedures is mandatory even when, after expressing a concern, an Associate asks that no action be taken or to "forget about what was said in confidence."

15

When management is informed, at any time and in any case, management has a duty to act.

All Associates are responsible for
- Strictly complying with the provisions of this Code, related Company policies, applicable divisional policies and all standards of ethical and lawful conduct while on Company property or while representing the Company
- Immediately reporting in accordance with the provisions of this Code all good faith suspected or actual violations of this Code or any unethical or illegal behavior or situation to the appropriate Company or divisional management without fear of retaliation.

50.     Under a section titled "Conflicts of Interest," the Code of Conduct states, in relevant part:

The Company is committed to the policy that all Company-related business conducted by Associates shall solely serve the interests of the Company. Associates, family members and friends shall not realize personal gain from an Associate's capacity as an employee, officer, director or independent agent acting on behalf of Quanex or any subsidiary or division, unless that gain is part of an approved compensation program . . . .

Associates must be scrupulous in avoiding situations in which personal interests conflict in any way (or even appear to conflict with) the interests of the Company. A conflict of interest exists when personal interests are (or appear to be) inconsistent with those of the Company, and make it difficult to perform Company work objectively and effectively.

51.     Under a section titled "Fair Dealing," the Code of Conduct states, in relevant part:

Associates shall endeavor to deal fairly with the Company's customers, suppliers, competitors, officers and employees. No Associate shall take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair dealing practice.

52.     Under a section titled "Public Company Reporting," the Code of Conduct states, in relevant part:

The Company is committed to assuring that all filings by Quanex with the U.S. Securities and Exchange Commission are timely and accurate.

Associates, depending on their position with the Company, may be called upon to provide necessary information to ensure that Quanex's public reports are complete, fair and understandable. The Company expects Associates to take this

responsibility very seriously and to provide prompt and accurate answers to inquiries related to Quanex's public disclosure requirements.

## QUANEX'S AUDIT COMMITTEE CHARTER

53.     Quanex's Audit Committee Charter states, in relevant part, that:

The primary purpose of the [Audit] Committee is to assist the Board in fulfilling its responsibility to:

(a) monitor the integrity of the Company's financial reporting process, including review of the financial reports and other financial information provided by the Company to the public and governmental and regulatory bodies;

(b) review the Company's system of internal financial and disclosure controls, and review the performance of the Company's internal audit function . . .

(d) review compliance with applicable laws and regulations which may represent material financial exposure to the Company;

(e) ensure ongoing effective risk management and oversight, including with regard to cyber-risk and information security risk; and

(f) otherwise discharge its oversight responsibilities to stockholders, potential stockholders and the investment community relating to the Company's accounting and financial reporting process and the audits of the Company's financial statements.

54.     Additionally, under a section titled "Committee Authority & Responsibility," the Audit Committee Charter states, in relevant part, that:

15. In performing its functions, the Committee shall undertake those tasks and responsibilities that, in its judgment, would most effectively contribute and implement the purposes of the Committee. The following functions are common recurring activities of the Committee in carrying out its oversight and risk management responsibility:

(a)     Review and discuss with management and the public accountants the Company's annual audited financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters required to be discussed pursuant to Public Company Accounting Oversight Board Auditing Standard 1301 or any successor to that Standard, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

17

(b)     Review and discuss with management and the public accountants the Company's quarterly financial statements, including disclosures made under "Management's Discussion and Analysis of Financial Condition and Results of Operations" or similar disclosures, and the matters required to be discussed pursuant to Public Company Accounting Oversight Board Auditing Standard 1301 or any successor to that Standard, prior to the filing of its Form 10-Q, including the results of the public accountants' review of the quarterly financial statements to the extent applicable . . .

(l)     Review disclosures made by the Company's principal executive officer or officers and principal financial officer or officers regarding compliance with their certification obligations as required under the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, including the Company's disclosure controls and procedures and internal controls for financial reporting and evaluations thereof . . .

(p)     Oversee that management has established and maintained processes to ensure adequate enterprise risk management.

## SUBSTANTIVE ALLEGATIONS

### Background

55.     Quanex is a Texas-based company operating in more than sixty-seven facilities globally that manufactures and distributes components in the building products industry, including the window, door, solar, refrigeration, custom mixing, building access, and cabinetry markets. The products provided by Quanex range from glass spacers and vinyl extrusions to cabinet components and access hardware. Quanex primarily serves customers based in North America and the United Kingdom, but the Company also serves international markets through operating locations in Germany, Mexico, Canada, and Italy, as well as through sales and marketing efforts in other countries.

56.     In September 2022, Defendant Wilson announced plans to dramatically grow Quanex and "achieve $2 billion of revenue" annually. Defendant Wilson referred to this plan as Quanex's "Growth with Purpose" or "Bigger" strategy. The plan was to reach $2 billion in annual revenue through a combination of "organic growth, inorganic growth or growth through

innovation."

57. However, this strategy seemingly failed as, by 2023, Quanex managed only $1.13 billion in revenue, a decline from its previous year. Quanex's revenue continued to fall throughout 2024, and in each of the first three quarters of 2024, Quanex's revenue was lower than the corresponding quarters in 2023. Overall, Quanex's revenue in 2024 was down by about 6% compared to the previous year.

58. Seeking to reverse Quanexs's performance decline, the Individual Defendants sought to undertake an acquisition to generate growth. The Company targeted the United Kingdom-based manufacturer Tyman, a manufacturer of building components such as handles, hardware, and sealing components for residential and commercial buildings. Tyman, similar to Quanex, had its own international footprint, with facilities located in, among other places, Mexico. Notably, if Tyman's $820 million in revenue for 2023 was to be added to Quanex's 2023 revenue, Quanex would hit Defendant Wilson's $2 billion revenue goal.

59. Quanex had considered acquiring Tyman prior to 2024, but in 2018 and 2020, Tyman rejected Quanex's acquisition offers. However, in April 2024, Quanex made an offer that Tyman finally accepted. On August 1, 2024, Quanex announced that it had closed on the $1.1 billion worth Tyman Acquisition.

60. The Tyamn Acquisition included acquiring Tyman's North American subsidiary AmesburyTruth, which made up almost all of Tyman's North American segment. By the beginning of 2024, AmesburyTruth had over 2,800 employees, representing over 75% of Tyman personnel, and accounted for the largest portion of Tyman's revenue.

61. By the time of the Tyman Acquisition, Tyman's AmesburyTruth manufacturing operations and facilities were suffering from longstanding and well-known problems within the

company and with customers. Tyman's AmesburyTruth manufacturing facilities were outdated, falling apart, and poorly maintained. These facilities could not keep up with customers' orders, and the products produced were of poor quality and produced too slowly. Tyman employees at AmesburyTruth facilities regularly suffered injuries and safety issues due to poor work conditions, which further undercut the timeliness and quality of products manufactured.

62.     AmesburyTruth's Monterrey Facility was the quintessential example of these issues. The Monterrey Facility was a hub that produced a variety of window and door components for Tyman's other facilities, which then sold those components to customers or combined them with other materials to make more complex products. Problems like poor quality manufacturing at the Monterrey Facility would thus reverberate throughout Tyman's entire operation.

63.     Another of Tyman's sites that depended on, and was negatively impacted by, the Monterrey Facility's prolific issues was Tyman's Statesville Facility. The Statesville Facility primarily sold components directly to customers. The Stateville Facility, like the Monterrey Facility, was operated by the AmesburyTruth subsidiary, and it suffered from similar operational problems as the Monterrey Facility.

### Former Employee Statements on Tyman's Pre-existing and Ongoing Facility Issues

64.     Multiple former employees of Quanex and Tyman recounted the well-known problems at the Monterrey Facility and other of Tyman's AmesburyTruth facilities prior to the Tyman Acquisition and throughout the Relevant Period. For example, FE1 recalled that the Monterrey Facility's manufacturing machinery was both outdated and suffered from a lack of maintenance leading to machine failures. FE1 explained that the facility's presses required monthly and annual preventive maintenance, including lubrication and systems checks, to function properly; however, such maintenance was often not performed.

65.     The outdated and poorly maintained machinery led to production problems at the Monterrey Facility. FE1 recalled that the Vice President of Hardware at Tyman's AmesburyTruth subsidiary was able to view the plant's performance data in the SAP system, which contained information on staff hours, inventory, raw materials, scrap, and other plant operational information, as well as weekly and monthly targets and the number of staff hours corresponding with the number of parts manufactured. Around March 2024, FE1 stated that this Vice President requested that security cameras be installed at the Monterrey Facility and pointed at three presses— press numbers 11H, 11C, and 11G—to enable even stronger monitoring since the performance data indicated that the Monterrey Facility's presses were producing components at an insufficient level. FE1 recalled that this Vice President ordered those three presses to run twenty-four hours per day, seven days a week even though the Monterrey Facility did not have the personnel, raw material, or properly functioning machinery to sustain that pace of work.

66.     As a result of the maintenance and production problems, FE1 recounted that orders at the Monterrey Facility were delayed and fell into backlog. For example, FE1 described a window component the Monterrey Facility made (called a "snubber") that fell into backlog at least two or three times during FE1's tenure.

67.     Exacerbating the production problems, and illustrating the poorly maintained machinery, the Monterrey Facility also suffered notable safety incidents. FE1 recalled an incident where workers at the Monterrey Facility were injured. For instance, in January or February 2024, FE1 stated that when an employee at the plant broke his leg on a press, the Monterrey Facility's Manager removed the injured employee "out a back door" and took him to the hospital.

68.     FE2 reported similar problems at the Monterrey Facility, including outdated machinery, poor production, and the resulting backlog. FE2 stated that, during his tenure with the

21

Company, "the Monterrey location was a s\*\*tshow," and from a supply chain perspective, was the most "disconnected and unorganized and shady" facility that FE2 had ever worked with. FE2 stated that the Monterrey Facility was a "persistent" and "well-known operational problem" within AmesburyTruth, when it was part of Tyman and then later when it was operated by Quanex. From FE2's first day of employment onward, FE2 encountered significant issues with the Monterrey Facility's production, communication, and accuracy. FE2 also learned that these were longstanding issues dating back to before FE2 began working at Tyman, with longtime AmesburyTruth employees informing FE2 that the Monterrey Facility "was a nightmare."

69.     As FE2 recounted, the Monterrey Facility had significant issues with its machinery and equipment. FE2 learned of those issues from communications with counterparts in Monterrey and at a Tyman facility in Texas and from the fact that the Statesville Facility consistently received fewer products from the Monterrey Facility than it was supposed to. When FE2 questioned why the Statesville Facility had not received the correct and sufficient amount of products it had ordered, FE2 was told that the Monterrey Facility's machines were not working. In addition, FE2 recalled that the Monterrey Facility had significant problems with the quality of the products it produced. FE2 witnessed incoming products from the Monterrey Facility that were often defective, failing integrity tests performed at the Statesville Facility, and even appearing rusty. FE2 added that she believed the Monterrey site performed integrity tests at their location as well, although she "didn't understand it because we always got junk."

70.     Further, the Monterrey Facility routinely produced and shipped less product than the Statesville Facility forecasted or expected. FE2 explained that the Statesville Facility supplied the Monterrey Facility with raw materials, and that the Monterrey Facility was then supposed to send back a specific amount of product. The Statesville Facility particularly depended on coils

22

produced by the Monterrey Facility, and to satisfy its customers' orders the Statesville Facility, needed to include coils produced by the Monterrey Facility. However, FE2 noted that the number of finished products returned from the Monterrey Facility were consistently far below what the Statesville Facility requested and below the corresponding amount of raw materials, such as expensive metals, that the Statesville Facility had provided for the order. For example, FE2 recalled an instance where the Statesville Facility sent enough raw material for 20,000 coils and received only 6,000 coils in return from the Monterrey Facility.

71.     FE2 also recounted that the Statesville Facility was unable to make reliable production plans and forecasts, which resulted in delayed shipments and customers cancelling orders. FE2 noted that coil delays stemming from problems with the Monterrey Facility could last six to eight weeks, leading customers to view AmesburyTruth as unreliable. In turn, FE2 stated that customers of the Statesville Facility cancelled not only orders for coils, but also cancelled orders for other products such as foam, urethane, and Tyman's G2 line of sealing materials for windows—one of Tyman's major products. Customer cancellations included large orders worth six figures, forcing management to try to prioritize the largest accounts when these backlogs occurred.

72.     FE2 recalled that management attempted to limit cancellations and delays stemming from failures at the Monterrey Facility by having the Statesville Facility and another Tyman facility work overtime manufacturing extra products, or outsourcing extra manufacturing to third parties. But this did not stop the delays and cancellations, FE2 stated, because the problems at the Monterrey Facility continued. Thus, FE2 stated that the Statesville Facility would sometimes place smaller orders than it needed with the Monterrey Facility, to try to ensure that it at least received some products on a timely basis. For instance, because the Monterrey Facility failed to

meet quality or quantity standards when it attempted to produce multiple coil sizes at the same time, the Statesville Facility often had to request just one size of coils at time, even when customers were demanding multiple sizes.

73.    On top of the customer cancellations, FE2 added that the Monterrey Facility's issues negatively impacted profitability at the Statesville Facility. FE2 explained that metal was one of the most expensive inputs in window manufacturing, and the Monterrey Facility's inefficiency and quality failures eroded margins. Moreover, FE2 noted that customers were frequently dissatisfied and demanded discounts, such that sometimes the Statesville Facility did not break even on orders due to the delays and defective products. FE2 repeatedly raised all of these issues with the Monterrey Facility at regular monthly Sales and Operations meetings that occurred throughout FE2's tenure. Such meetings included the CEO of AmesburyTruth North America, as well as other high ranking executive officers throughout the company.

74.    Moreover, FE2 recounted that facilities throughout Tyman's AmesburyTruth subsidiary generally had problems like those at the Monterrey Facility, because AmesburyTruth needed to make major investment in machinery and equipment which it failed to do. FE2 stated that equipment issues were a problem "across the board" and were "a huge burden in every plant" at AmesburyTruth. For example, FE2 explained that much of the machinery in the Statesville Facility, and another AmesburyTruth facility located in Sioux Falls, South Dakota, was approximately 60 years old. This old equipment required constant maintenance and improvisation to keep running, and in some cases, replacement parts were no longer manufactured due to the age of the machinery or management had to hire outside specialists to help repair it.

75.    FE2 also stated that between May and September 2024, the months leading up to the Tyman Acquisition, AmesburyTruth's Director of Operations spent extensive time traveling

24

to the Monterrey Facility and the Sioux Falls facility, often visiting the Monterrey Facility once or twice a month. As FE2 stated, "these locations were the problem children with output."

76.     FE3 further confirmed issues with older machinery, production slowdowns, and order backlogs. FE3 recalled that the Monterrey Facility was widely known as a source of ongoing problems among staff at the Statesville Facility. FE3 continued that problems at the Monterrey Facility were a frequent topic of discussion among staff at the Statesville Facility, citing the fact that FE3 frequently overheard the engineering team's meetings. FE3 noted that the primary product affected by production issues at the Monterrey Facility were window support coils, which were one of the main products manufactured there.

77.     FE3 also noted that the machinery at the Statesville Facility was extremely old and prone to breakdowns. FE3 stated that some machines were so outdated that replacement parts were no longer manufactured, and one machine had been down for years before an engineer was able to fix it. Thus, as FE3 explained, when a machine went down, the associated product line could not be produced at all.

78.     The production problems at the Monterrey Facility and Statesville Facility led to order backlogs and triage among its customers. For example, FE3 recalled that the Monterrey Facility frequently had to ask the Statesville Facility to produce large amounts of products with an unrealistic production timeframe. In turn, FE3 explained that such requests from the Monterrey Facility slowed down and at times completely stopped the production of existing customer orders at the Statesville Facility, resulting in delayed shipments to those customers. Further, because these requests and slowdowns created order backlogs for the Statesville Facility, FE3 recounted that it forced the Statesville Facility to "pick and choose" which customer orders it would address first and which customers had to wait for products. Exacerbating this problem, it could take hours to

25

changeover a production line that was already manufacturing one type of component for the Statesville Facility's customers so that it could manufacture a differing component for the Monterrey Facility, and hours more to switch the production line back later on. FE3 noted that these issues began prior to the Quanex acquisition.

79.    FE3 also recounted that the various problems with the Monterrey Facility were raised in forecasting meetings at the Statesville Facility. The meetings addressed customer order and production planning, and were attended by personnel from finance, plant management, buyers, and scheduling. FE3 stated that these meetings occurred throughout FE3's tenure, which included the Relevant Period.

80.    FE4 also corroborated the issues with the Monterrey Facility and Statesville Facility. FE4 recounted that both the Monterrey Facility and Statesville Facility had issues with older machinery while FE4 worked at Tyman and then Quanex, and that these issues were well known. As FE4 explained, some of these machinery issues caused shutdowns, which happened about once a month and could cause a production line to stop for as long as a whole shift or a whole day. FE4 understood that these shutdowns were caused by machinery needing upgrades. About midway through FE4's tenure, FE4 tried to address some of the machinery issues. FE4 believed that both the President of AmesburyTruth North America and the Statesville Facility were aware that the machinery problems were causing shutdowns.

81.    FE4 confirmed that the shutdowns pushed back production and, in turn, caused a backlog on customer orders.. FE4 "used to hear a lot" about this backlog, as it existed throughout FE4's tenure. Further, FE4 explained, that part of the backlog was caused by manufacturing issues not just at the Monterrey Facility, but by similar issues at the Statesville Facility.

82.    FE4 added that safety issues, such as from machines, increased the backlog, and

that when a major incident happened on a specific line, it could shut the line down for a day or two. Over the last two to three years of FE4's tenure, preventative maintenance were performed once a week on a rotating basis on certain production lines to try to address these issues and because the machines were older and needed the maintenance to keep running. This added to the backlog because machines had to be shut down for maintenance even if they were then in use.

83. FE4 recalled that the Statesville Facility's Manager was involved in "a lot of meetings" where issues regarding the ongoing backlog as well as the production issues at the Statesville Facility and Monterrey Facility were discussed. These meetings also included production managers, quality managers, and a few engineers. FE4 was aware of these meetings because if any need for additional training arose from them, FE4 was informed and then provided training to make sure employees on the production floor understood the workflow and instruction. FE4 was sure that the President of AmesburyTruth North America was aware of the ongoing issues, because the Statesville Facility Manager reported to him. The President of AmesburyTruth North America would also visit the facilities, including visiting Stateville "quite a few times," and stay for a day or two.

84. FE5 further corroborated the issues with the Monterrey Facility, which continued well after the Tyman Acquisition. Among other things, FE5 was tasked by Quanex to fix the ongoing issues at the Monterrey Facility. FE5 recounted that, dating back to when the Company acquired Tyman, the Monterrey Facility, along with its employees, were overwhelmed and over-capacity. In addition to an employee shortage, FE5 noted that the Monterrey Facility had issues with its machinery and tools, because underinvestment by Tyman had left them outdated and unable to operate at full capacity.

85. FE5 explained that the Monterrey Facility "could only run so much in 24 hours,"

27

while it also had "to do maintenance." As an example, if an injecting tool is supposed to be able to handle 50 pieces per injection, the outdated tools at the Monterrey Facility could only handle 20 pieces. FE5 stated that there was not enough money invested to buy new tools and get production back up to 50 pieces, and FE5 believed that Tyman had been "holding back money."

86.     By the time FE5 began working at the Monterrey Facility, and as a result of the aforementioned production problems, FE5 noticed "right away" that the Monterrey Facility had a backlog with customers worth approximately $2 million. FE5 identified that the backlog dated back to when Tyman owned the Monterrey Facility, and indicated that the facility "was poorly managed under Tyman."

87.     FE5 also recounted that, even after the Tyman Acquisition, product at the Monterrey Facility was not moving fast enough to the Company's other facilities that depended on the Monterrey Facility. FE5 had a conversation in December 2024 with representatives of Quanex's customer Andersen Windows who recommended to Quanex that FE5 try to fix the well-known issues at the Monterrey Facility. However, the representative warned FE5 that, in regard to the Monterrey Facility, "you're screwed."

88.     FE5 recalled that after taking over the Monterrey Facility, Quanex invested money into the Monterrey Facility to try to fix the foregoing problems. When FE5 started making weekly trips to the Monterrey Facility, FE5 tried to address those problems too. But FE5 and Quanex's progress was slowed down by the integration of Tyman and because Quanex had not decided which Tyman personnel would remain at the Monterrey Facility and who needed to be replaced. So, it took FE5 a while just to get a team in place to start handling the issues. In the interim, FE5 recalled that Quanex had to take costly measures, like bringing in third-parties to help with die casting, to try to improve production at the Monterrey Facility.

89.     Further, to attempt to make up for lost time and reduce the backlog, FE5 recalled that Quanex was spending $140,000 per month to airfreight products from the Monterrey Facility to other facilities in the United States. While this reduced the Monterrey Facility's backlog somewhat, a significant backlog remained by the time FE5 left Quanex, and the backlog actually started to increase again.

90.     In addition to the backlog, FE5 recounted that as a result of the underinvestment in the Monterrey Facility, it also had failed to comply with Occupational Safety and Health Administration standards. FE5 stated that employees were suffering injuries at the Monterrey Facility dating back to the Tyman era and continuing after Quanex took over.

91.     FE1, FE2, FE3, and FE4 also confirmed the problems after the Tyman Acquisition that FE5 referred to. For example, FE1 recalled that in July 2024, around the time of the shareholder vote for the Tyman Acquisition, one of the Monterrey Facility's presses failed due to engine and grounding issues. A maintenance technician admitted to FE1 that the press had not received annual maintenance in years because it was "too expensive," which was confirmed to FE1 by a more senior technician after FE1 escalated concern about the press. FE3 also noted that the Monterrey Facility's unrealistic production requests to the Statesville Facility, and the Statesville Facility's resulting backlogs, escalated in the summer of 2024.

***Individual Defendants Failed to Notify Shareholders of These Issues***

92.     As a condition of pursuing the acquisition of Tyman, the Individual Defendants required the Company to conduct extensive due diligence into Tyman, including its core manufacturing functions. Such due diligence began in September 2022 and continued on and off until April 2024. When the Company announced the Tyman Acquisition, they emphasized that, based on their due diligence, "we have mapped out the global manufacturing locations between

29

the two companies," and displayed a slide showing, among other facilities, the Monterrey Facility. Defendant Zuehlke explained that "based on the diligence performed leading up to today's announcement, we've undertaken a preliminary operational review of and developed an integration plan for the combined business." Such statements confirmed that Defendants investigated Tyman's operations and manufacturing facilities, including the Monterrey Facility.

93.    Analysts accepted these statements as factual and responded positively to the Tyman Acquisition. For example, Benchmark, in its April 23, 2024 report, praised Quanex's "Improved Geographic Penetration" upon the integration of "Tyman's 10 North American manufacturing facilities [which] support nearly two thirds of [Tyman's] existing business."

94.    To pay for the Tyman Acquisition, the Company proposed that it would purchase Tyman by issuing common stock worth over 20% of Quanex's then-outstanding shares. For Quanex to enact this payment plan, pursuant to SEC regulations, the Company needed to obtain shareholder approval of the acquisition. Thus, on June 6, 2024, Quanex filed a proxy statement on Schedule 14A with the SEC soliciting stockholders to vote in favor of the Tyman Acquisition in an upcoming special meeting of the stockholders (the "2024 Special Proxy").

95.    To induce shareholders to vote for the Tyman Acquisition, the 2024 Special Proxy contained materially false and misleading statements wherein Quanex claims that the Tyman Acquisition was strategic as it created an enlarged group with significant cross-selling opportunities amongst a highly complementary customer base, increased the Company's global reach, enhanced scale, optimized the Company's asset portfolio, and moved Quanex closer to being a comprehensive solutions provider. However, in reality, Tyman's facilities, particularly the Monterrey Facility, were suffering from longstanding well-known problems that could harm the Company and its future prospects.

96.     Throughout the Relevant Period, the Individual Defendants touted the benefits of Tyman's facilities to the Company, the successful integration of Tyman's facilities into Quanex and the increased value that the Tyman Acquisition would create for Quanex. However, in reality, Quanex acquired facilities with significant longstanding, well-known operational and production issues, Quanex failed to properly invest in the acquired Tyman facilities, the degraded tooling and equipment conditions at the acquired Tyman facilities, particularly at the Monterrey Facility, caused the Company to incur significant costs and reduced any benefits from the Tyman Acquisition.

***Individual Defendants' Materially False and Misleading Statements***

97.     On June 6, 2024, the Company filed the 2024 Special Proxy. The 2024 Special Proxy asked stockholders to vote on the Company's proposal to acquire Tyman. Among other things, the 2024 Special Proxy assured investors that Quanex's acquisition of Tyman would enhance Quanex's overall manufacturing, performance, and ability to serve its customers, stating, in relevant part, that "the acquisition by Quanex of Tyman offers a unique opportunity to create a leading supplier of components to OEMs [original equipment manufacturers] in the building products sector globally. The Enlarged Group will: . . . ***capitalize on expanded engineering, design and manufacturing capabilities***." The 2024 Special Proxy also stated, in relevant part, that

> [T]he Transaction [i.e., merger] presents an opportunity for Quanex to execute on its 'BIGGER' strategic roadmap for growth and value creation and represents and opportunity to create a comprehensive solutions provider in the building products industry, leveraging the complementary product portfolios of trusted brands and ***expanded engineering, design and manufacturing capabilities*** of both groups to deliver value to consumers, shareholders and other stakeholders.

98.     The 2024 Special Proxy further touted Quanex's and Tyman's operations, stating, in relevant part, that "[d]uring the implementation of the integration plan, ***Quanex will place a strong focus on maintaining operational excellence*** and minimizing any disruption to

31

customers."

99.     Moreover, the 2024 Special Proxy minimized increased operational costs from Quanex's acquisition and integration of Tyman, stating that "*[p]otential areas of dis-synergy expected to arise in connection with the Transaction have been considered and were determined by the Quanex Directors to be immaterial for the analysis*."

100.     The 2024 Special Proxy also presented certain risks in the Company's acquisition of Tyman as hypothetical when they had already materialized, stating, in relevant part:

> *Loss of competitive advantage could negatively impact Tyman's profitability.*[3]
>
> *Loss of competitive advantage may adversely affect Tyman's financial performance or reputation in the short to medium term. Tyman's ability to maintain its competitive advantage is based on a wide range of factors including the strength of Tyman's brands, the breadth and depth of its portfolio, the level of quality and innovation reflected in its products, its supply chain flexibility, its excellent customer service and technical support, and the depth of customer relationships it nurtures, all supported by fair and competitive pricing. Failure to perform on any one of these aspects may lead to erosion of competitive advantage over time, and in turn to loss of customers to competition*.

101.     Furthermore, the 2024 Special Proxy incorporated by reference statements from the Company's Form 10-K filed with the SEC on December 15, 2023, for the fiscal year ended October 31, 2023 (the "2023 10-K").[4] The 2024 Special Proxy incorporated by reference the following statement on equipment failures from the 2023 10-K as a hypothetical scenario, even though such problems had already materialized, stating in relevant part:

> **Equipment failures or catastrophic loss at any of our manufacturing facilities could prevent us from producing our products.**[5]
>
> *An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability*

---

[3] Emphasis in original.

[4] Quanex's fiscal year begins on November 1st and ends on October 31st.

[5] Emphasis in original.

*to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.*

102. On September 6, 2024, the Company held an earnings call for analysts and investors to discuss its financial results for the third quarter of fiscal year 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Wilson commented on similarities between Quanex and Tyman, and how such similarities would be beneficial to the Company, stating, in relevant part, that "*[o]ne of the things that we identified fairly early, the cultures are very similar on things that are extremely important to us, how we serve our customers. . . . the focus on safety, our willingness and anxiousness to develop people. All of those things are extremely similar*."

103. On the same day, the Company filed a Form 10-Q with the SEC reporting its financial results for the third quarter of fiscal year 2024 (the "3Q24 10-Q"). The 3Q24 10-Q was signed by Defendant Zuehlke and included certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wilson and Zuehlke. The 3Q24 10-Q incorporated by reference the risk disclosures set forth in the 2023 10-K which characterized certain risks as hypothetical when they had already materialized including, in relevant part:

> *An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.*

104. Also during the 3Q24 Earnings Call, when an analyst asked about an "dis-synergy risks," in the Company's integration of Tyman, Defendant Wilson stated, "*I don't see any initial dis-synergy*."

105. On December 13, 2024, the Company hosted an earnings call for analysts and investors discussing its financial results for the fourth quarter of fiscal year 2024 (the "4Q24

Earnings Call"). During the 4Q24 Earnings Call, Defendant Wilson touted the benefits of Quanex acquiring Tyman stating that Quanex is "*a manufacturing company that has a broad set of core competencies*[,]" and that acquiring Tyman allowed the Company to "*think much bigger than we currently are. . . . it gives us the opportunity to really build off of what is the strength of Quanex and that's our manufacturing capabilities*." Defendant Wilson further stated that Quanex was achieving its objectives by "*combin[ing] some of the legacy Tyman and some of the legacy Quanex*" facilities into bigger operating segments.

106.    Also during the 4Q24 Earnings Call, Defendant Wilson touted the Company's integration of Tyman, stating, in relevant part, that "*[f]rom an operational standpoint, the Quanex team continues to perform exceptionally well, with the focus on the integration of Tyman and the pursuit of ongoing capacity and margin optimization projects*."

107.    On December 16, 2024, the Company filed its annual Form 10-K with the SEC for the fiscal year ended October 31, 2024 (the "2024 10-K"). The 2024 10-K was signed by Defendants Davis, Stevens, Maier, Waltz, Lippert, Hughes, Shah, Singhi, Wilson, and Zuehlke. Attached to the 2024 10-K were certifications made pursuant to SOX signed by Defendants Wilson and Zuehlke. The 2024 10-K touted the Company's strategy initiatives, claiming that the Company was committed to preventative maintenance, stating, in relevant part:

> Our vision is to be the preferred supplier to our customers in each market we serve and exceed expectations of all stakeholders. Our strategy to achieve this vision includes the following . . .
>
> • *realize improved profitability in our manufacturing processes through*: (1) *ongoing preventive maintenance programs*; (2) better utilization of our capacity by focusing on operational efficiencies and reducing scrap; (3) marketing our value added products; and (4) *focusing on employee safety*[.]

108.    Moreover, the 2024 10-K characterized the following statement on equipment failures as a hypothetical scenario, even though such problems had already materialized, stating in

34

relevant part:

> *An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.*

109.    On January 28, 2025, the Company filed a proxy statement on a Schedule 14A with the SEC (the "2025 Proxy"). The 2025 Proxy assured investors that the Board was overseeing risks to the Company, stating, in relevant part:

> Our Board is responsible for oversight of the Company's risk assessment and management process, and it has empowered its committees with oversight of specific, material risks tailored to each committee's area of focus. The Board delegated to the Compensation Committee basic responsibility for oversight of management's compensation risk assessment, and that Committee reports to the Board on its review. The Board also delegated tasks related to risk process oversight to the Audit Committee, which also reports the results of its review to the Board. Management regularly reports to each committee regarding compliance with existing policies and procedures and to discuss changes or improvements that may be required or desirable and the committees make recommendations to the Board based on such discussions. Specifically, the Company's Director of Audit Services reports directly to the Audit Committee and has direct and unrestricted access to the Committee. In addition, the Audit Committee meets in executive session at each of its meetings with the Company's Director of Audit Services, the Company's Chief Financial Officer, and a representative of the Company's outside auditor. The Company's General Counsel also updates the Board at each of its quarterly meetings.

110.    On February 6, 2025, the Company held its Investor and Analyst Day conference and presentation (the "2025 Investor/Analyst Day"). During the 2025 Investor/Analyst Day, Defendant Zuehlke highlighted the ongoing factors that were under the Company's "*control*," including, particular, "*safety culture, operational excellence and working capital management*." Defendant Zuehlke further explained that these factors under the Company's control benefitted Quanex's "*EBITDA*."

111.    On March 11, 2025, the Company filed a Form 10-Q with the SEC reporting its

35

financial results for the first quarter of fiscal year 2025 (the "1Q25 10-Q"). The 1Q25 10-Q was signed by Defendant Zuehlke and included certifications made pursuant to SOX signed by Defendants Wilson and Zuehlke. The 1Q25 10-Q discussed the operations of the Company, stating, in relevant part: "*We leverage efficient production and distribution processes and engineering expertise to provide our customers with specialized products*," and that "*these capabilities enhance our ability to provide value to our customers.*"

112.    The 1Q25 10-Q further incorporated by reference the risk disclosures set forth in the 2024 10-K which characterized certain risks as hypothetical when they had already materialized including, in relevant part:

> *An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.*

113.    On June 5, 2025, the Company hosted an earnings call for analysts and investors to discuss its results for the first quarter of fiscal year 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Wilson touted Quanex's integration of Tyman stating, in relevant part:

> *Operationally, I'm very pleased with our performance and the improvements we've already seen as part of the integration process. We achieved record safety performance in the first quarter, along with improvements in service and quality metrics. These gains are the results of sharing best practices between the legacy Quanex and Tyman teams, as well as the benefit of migrating to our new operating segments.*
>
> *Moving forward, our operational focus will remain on safety culture, employee engagement, working capital improvements, and optimizing return on net assets to maximize our cash flow generation. . . . So in summary, while short-term market headwinds persist, the Quanex team continues to perform well and the anticipated benefits of the Tyman acquisition are coming to fruition as we expected.*

114.    On June 6, 2025, the Company filed a Form 10-Q with the SEC for the second quarter of fiscal year 2025 (the "2Q25 10-Q"). The 2Q25 10-Q was signed by Defendant Zuehlke and included certifications made pursuant to SOX signed by Defendants Wilson and Zuehlke. The 2Q25 10-Q discussed the operations of the Company, stating, in relevant part: "*We leverage efficient production and distribution processes and engineering expertise to provide our customers with specialized products*," and that "*these capabilities enhance our ability to provide value to our customers*."

115.    Moreover, the 2Q25 10-Q framed risks affecting the company as hypotheticals that "could" or "may" negatively impact the Company, including its "*ability to integrate and implement our plans forecasts and other expectations with respect to Tyman*."

116.    The 2Q25 10-Q also incorporated by reference the risk disclosures set forth in the 2024 10-K which characterized certain risks as hypothetical when they had already materialized including, in relevant part:

> *An interruption in production capabilities at any of our facilities due to equipment failure, catastrophic loss, or other reasons could result in our inability to manufacture products, which could severely affect delivery times, return or cancellation rates, and future sales, any of which could result in lower sales and earnings or the loss of customers.*

117.    On the same day, the Company hosted an earnings call for analysts and investors to discuss its financial results for the second quarter of fiscal year 2025 (the "2Q25 Earnings Call"). During the 2Q25 Earnings Call, Defendant Wilson touted the attention to safety that Quanex focused on and how this would help deliver on the synergies in integrating Tyman, stating, in relevant part, that "*[t]he Quanex team continues to execute at a high level, which has resulted in excellent safety performance as well as delivering better than anticipated synergies*."

118.    The above statements in ¶¶ 97–117 were materially false and/or misleading and

failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company inherited problems from the Tyman Acquisition, namely with the Monterrey Facility; (ii) the Company significantly underinvested in its procedures and policies regarding tooling and equipment maintenance in its acquired facilities; (iii) the Company's insufficient investment in tooling and equipment conditions caused the equipment to degrade to near "catastrophic" levels; (iv) because of the inherited problems and underinvestment in equipment maintenance, the Company was likely to incur significant costs and delayed benefits from the Tyman Acquisition; (v) the Company knew that there were issues regarding tooling and equipment maintenance in its facilities; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth is Revealed

119.    The truth began to emerge on September 4, 2025, when Quanex issued the 3Q25 Press Release. In the 3Q25 Press Release, the Company disclosed for the first time that "***operational issues related to the legacy Tyman window and door hardware business in Mexico that are going***" which "impacted results ***more than expected*** during the third quarter of 2025." The Company also reported diluted EPS of ($6.04), compared to $0.77 in the prior year period, and an adjusted EBIDTA of $70.30. The Company further disclosed that it was "adjusting for lower expected volumes and pushing out the timing of when [the Company] expect[s] to realize procurement savings" related to the Tyman Acquisition.

120.    On this news, the Company's stock price fell $2.73, or 13%, from a closing price

38

of $20.91 per share on September 4, 2025, to a closing price of $18.18 per share on September 5, 2025, on heavy trade volume.

121.    On September 5, 2025, the truth fully emerged during the 3Q25 Earnings Call. During the 3Q25 Earnings Call, Defendant Wilson stated the significant issues that the Company faced regarding the hardware business in Mexico, stating, in relevant part:

> I want to also take a moment to detail some ***operational issues we inherited*** that are specific to our window and door hardware business in Mexico, which impacted results in the third quarter more than expected.

> Specifically, we identified tooling and equipment issues at our Monterrey, Mexico facility, which, among other things, impacts backlog and leads to inefficiencies and increased costs for items such as expedited freight. ***These operational challenges negatively impacted EBITDA in the Hardware Solutions segment by almost $5 million in the third quarter alone*** . . . .

> What we identified is really the systems underneath how do you methodically anticipate and plan for tooling repairs. I don't want to say it was nonexistent, ***but again, not up to the standards***. And you get to a point where if you're not maintaining tools and equipment, but you continue to try to run and you block off cavities, then it creates quality problems and other issues, and it will eventually catch up to you.

> And I think ***what we identified midyear here as we get deeper and deeper into the integration*** [of Tyman] and we start understanding the processes and kind of put Quanex procedures and policies into place is that ***we were underinvested and that the tooling condition and the equipment condition was not where we wanted to be***, and it was not going to be healthy to support our customers. ***So we had to make some changes and fix some things before it was catastrophic***.

122.    On this news, the Company's stock price continued to fall $1.98, or 10.9%, from a closing price of $18.18 per share on September 5, 2025, to a closing price of $16.20 per share on September 8, 2025, on heavy trade volume.

*Share Repurchases*

123.    According to the Company's public filings, while the price of the Company's stock was artificially inflated due to the false and misleading statements detailed above, the Individual

Defendants caused the Company to repurchase approximately 1.5 million shares of its own stock for a total of $29.2 million during the Relevant Period.

124.    According to the Company's quarterly and annual reports filed on Forms 10-Q and 10-K with the SEC, Quanex made the following repurchases of its own stock during the Relevant Period:

| Dates of Stock Repurchases | Number of Shares Repurchased | Average Price Per Share on Date of Repurchase | Total Cost of Repurchase |
|---|---|---|---|
| December 2024 | 150,000 | $24.66 | $3,699,000.00 |
| March 2025 | 737,903 | $19.76 | $14,580,963.30 |
| April 2025 | 521,504 | $17.09 | $8,912,503.36 |
| July 2025 | 100,000 | $20.54 | $2,054,000.00 |

125.    Given that the price of Quanex stock was $16.20 per share on September 8, 2025, after the corrective disclosures were made, the true value of the 1,509,407 repurchased shares was roughly $24.5 million. Accordingly, the Individual Defendants caused the Company to overpay approximately $4.7 million to repurchase these shares during the Relevant Period.

***Harm to the Company***

126.    As a direct and proximate result of the Individual Defendants' misconduct, Quanex has lost and expended, and will lose and expend, millions of dollars.

127.    Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendants Wilson and Zuehlke, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

128.    Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

129.    Furthermore, the Securities Class Action has exposed the Company to massive class-wide liability.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

130.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

131.    Plaintiff will adequately and fairly represent the interests of Quanex and its shareholders in enforcing and prosecuting its rights.

132.    Quanex is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

133.    Plaintiff is a current shareholder of Quanex and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

134.    A pre-suit demand on the Board of Quanex is futile and, therefore, excused. At the time this action was commenced, the nine-person Board consisted of Individual Defendants Wilson, Davis, Hughes, Maier, Lippert, Waltz, Shah, and Singhi (the "Director Defendants") and non-party Mary K. Lawler (together with the Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for the misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

135.    The Director Defendants either knew or should have known of the false and

41

misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

136. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

137. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

138. As members of the Board charged with overseeing the Company's affairs, each of the Director Defendants had knowledge, or the fiduciary obligation to inform themselves, of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Quanex, the Director Defendants knew, or should have known, the material facts surrounding Quanex's financial condition and internal control mechanisms.

139. Defendant Wilson is not disinterested or independent. In addition to serving as a director, Defendant Wilson also serves as the Company's President, CEO, and as Chairman of the Board. Thus, as conceded in the Company's proxy statement filed on January 28, 2026, on a Schedule 14A with the SEC (the "2026 Proxy"), Defendant Wilson is a non-independent director. Furthermore, Defendant Wilson is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged

herein, specifically issuing materially false and misleading statements during the Relevant Period.

140. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

141. Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142. Additionally, the Directors have taken no action to redress the harm suffered by the Company resulting from the misconduct alleged herein.

143. Defendants Hughes, Shah, and Singhi (the "Audit Defendants") served on the Company's Audit Committee during the Relevant Period, and pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial reporting and the underlying internal controls and procedures over financial reporting. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business, finances, and operations, as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

144. The Director Defendants, as members of the Board, were and are subject to the

43

Company's Code of Conduct.  The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct.  The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

145.    The acts complained of herein constitute violations of fiduciary duties owed by Quanex's officers and directors, and these acts are incapable of ratification.

146.    Thus, for all the reasons set forth above, the Director Defendants are unable to consider a demand with the requisite disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>COUNT I</u>**
**Against the Individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

149.    Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

15 U.S.C. § 78n(a).

150.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

151.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Special Proxy and 2025 Proxy, which were filed with the SEC. As alleged above, the 2024 Special Proxy and 2025 Proxy were materially false and misleading because they failed to disclose, *inter alia*, that: (i) the Individual Defendants knew of the issues with Tyman's facilities, including, among others, the issues at the Monterrey Facility; (ii) these issues would harm any benefits Quanex may receive in acquiring Tyman; and (iii) the Board and management were not properly overseeing risks to the Company.

152.    The misrepresentations and omissions in the 2024 Special Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Special Proxy, including, but not limited to, the acquisition of Tyman and its subsidiaries by Quanex. Specifically, the materially false and misleading statements contained in the 2024 Special Proxy misleadingly induced shareholders to vote to approve the Tyman Acquisition.

153.    The misrepresentations and omissions in the 2025 Proxy were material to Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy,

including, but not limited to, the reelection of certain of the Defendants to the Board. Specifically, the materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Davis, Hughes, Lippert, Maier, Shah, Singhi, Waltz, and Wilson to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

154.    As a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Special Proxy and 2025 Proxy, the Company has sustained significant damages.

155.    Plaintiff, on behalf of Quanex, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)) and Rule 10b-5 (17 C.F.R. § 240.10b-5)

156.    Plaintiff incorporated by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

157.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Quanex. Not only is Quanex now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Quanex by the Individual Defendants.

158.    During the Relevant Period, while the price of the Company's stock was artificially inflated as a result of the false and misleading statements issued, the Individual Defendants caused the Company to overpay by over $4.7 million to repurchase approximately 1.5 million shares of Quanex common stock.

159.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases,

public statements, and periodic and current reports filed with the SEC.

160.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Quanex not misleading.

161.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Quanex.

162.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

163.    The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have caused the Company to expend over approximately $29.2 million in the repurchase of Quanex stock at artificially inflated prices and have exposed the Company to millions of dollars in potential class-wide damages in the Securities Class Action.

164.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165.    Plaintiff, on behalf of Quanex, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Violations
### of Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a))

166.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions of control within the Company, the Individual Defendnats had the authority to cause the Company to issue materially false and misleading statements, and to repurchase Quanex stock at prices artificially inflated by those materially false and misleading statements.

168.    Plaintiff, on behalf of Quanex, has no adequate remedy at law.

## COUNT IV
### Against the Individual Defendants
### For Breach of Fiduciary Duty

169.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

171.    Each of the Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, good faith, loyalty, oversight, and supervision.

172.    The Individual Defendants engaged in a sustained and systematic failure to properly

exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

173. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company inherited problems from the Tyman Acquisition, namely with its Monterrey Facility; (ii) the Company significantly underinvested in its procedures and policies regarding tooling and equipment maintenance in its acquired facilities; (iii) the Company's insufficient investment in tooling and equipment conditions caused the equipment to degrade to near "catastrophic" levels; (iv) because of the inherited problems and underinvestment in equipment maintenance, the Company was likely to incur significant costs and delayed benefits from the Tyman Acquisition; (v) the Company knew that there were issues regarding tooling and equipment maintenance in its facilities; (vi) the Company failed to maintain adequate internal controls and risk oversight mechanisms; and (vii) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

174. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained,

or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

175.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

176.    Moreover, in further breach of fiduciary duties during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase approximately 1.5 million shares of its own common stock at artificially inflated prices before the fraud was exposed.

177.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

178.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

179.    Plaintiff, on behalf of Quanex, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants for Aiding and**
**Abetting Breach of Fiduciary Duty**

180.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

181.     By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

182.     Plaintiff on behalf of Quanex has no adequate remedy at law.

**COUNT VI**
**Against the Individual Defendants for Unjust Enrichment**

183.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

184.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Quanex.

185.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Quanex that was tied to the performance or artificially inflated valuation of Quanex, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

186.     Plaintiff, as a shareholder and a representative of Quanex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and

51

other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

187.   Plaintiff on behalf of Quanex has no adequate remedy at law.

## COUNT VII
### Against the Individual Defendants for Waste of Corporate Assets

188.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

189.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.   It resulted in continuous, connected, and ongoing harm to the Company.

190.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; (ii) causing the Company to repurchase approximately 1.5 million shares of its own common stock at artificially inflated prices; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Class Action.

191.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

192.   Plaintiff, on behalf Quanex, has no adequate remedy at law.

## COUNT VIII
### Against Individual Defendants Wilson and Zuehlke for Contribution
### Under Section 10(b) and 21D of the Exchange Act

193.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

194.   The Company and Individual Defendants Wilson and Zuehlke are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for

violations of Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to the Individual Defendants Wilson's and/or Zuehlke's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

195.    Defendants Wilson and Zuehlke, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

196.    Accordingly, Defendants Wilson and Zuehlke are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

197.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Wilson and Zuehlke.

198.    Plaintiff, on behalf of Quanex, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and

all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing Quanex to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims set forth herein.

DATED: April 24, 2026                    **RIGRODSKY LAW, P.A.**

By:    */s/ Gina M. Serra*

Gina M. Serra
Attorney-in-Charge
Fed. No. 3950822
1007 North Orange Street, Suite 453
Wilmington, DE 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

Vincent A. Licata
Leah B. Wihtelin
225 Broadway, Suite 3707
New York, NY 10007
Telephone: (212) 201-7690
Email: vl@rl-legal.com
Email: lw@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com